# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

DERRICK ARNELL MONDOWNEY,        *

Plaintiff        *

v.        *        Civil Action No. ELH-17-1538

BALTIMORE COUNTY DETENTION    *
CENTER, *et al.*
        *
Defendants

        ***

## MEMORANDUM OPINION

Plaintiff Derrick Mondowney, who is self represented, has filed a civil rights suit against several defendants, pursuant to 42 U.S.C. § 1983. He complains that he was denied constitutionally adequate medical care while he was detained at the Baltimore County Detention Center ("BCDC").[1]

---

[1] Mondowney filed two related cases, which were subsequently consolidated. The cases were originally assigned to Judge J. Frederick Motz. In October 2017, due to the retirement of Judge Motz, the cases were reassigned to me.

Mondowney's first case was filed in December 2016, as Civil Action No. JFM-16-3932 ("Case I"). He initially sued BCDC. *Id.*, ECF 1. In supplemental complaints (ECF 4, ECF 5, ECF 6), with exhibits, plaintiff added several defendants: Deborah Richardson; Zowie Barnes, M.D.; Stephen Verch; Bonita Cosgrove; Sgt. Martin Leak; and Sgt. Ronald Church, Jr. However, the case was closed because plaintiff moved and failed to provide the court with a new address. ECF 9. Thereafter, plaintiff's motion for reconsideration (ECF 13) was granted and the case was reopened. ECF 14.

Then, on June 5, 2017, plaintiff filed his second case, docketed as Civil Action No. JFM-17-1538 ("Case II"), with exhibits. In substance, it was a duplicate of Case I. Apparently, plaintiff had been transferred from BCDC to Jessup Correctional Institution ("JCI") and, due to the dismissal of Case I (*see id.*, ECF 9), he filed Case II.

On September 11, 2018, the cases were consolidated and the motion to dismiss filed by BCDC, Cosgrove, and Verch was granted. Case II, ECF 35; ECF 36. The Complaint was also dismissed as to Richardson. *Id.* As a result of the consolidation (*see* ECF 26 in Case I; ECF 36 in

Defendants Sergeant Ronald Church, Jr. and Sergeant Martin Leak[2] ("Correctional Defendants") have moved to dismiss or, in the alternative, for summary judgment. ECF 38. Their motion is supported by a memorandum of law (ECF 38-1) (collectively, "Correctional Motion") and exhibits. Defendants Correct Care Solutions, LLC and Zowie Barnes, M.D. ("Medical Defendants") have filed a motion for summary judgment (ECF 49), supported by a memorandum of law (ECF 49-1) (collectively, "Medical Motion") and exhibits. Plaintiff opposes both motions. ECF 41; ECF 54. The Medical Defendants have replied. ECF 56. Plaintiff has also filed motions for summary judgment. ECF 53; ECF 55.

No hearing is necessary to resolve these motions. *See* Local Rule 105.6. For the reasons that follow, defendants' motions, construed as motions for summary judgment, shall be granted. Plaintiff's summary judgment motions shall be denied.[3]

## I. Background

### A. Plaintiff's allegations

In a prior Memorandum Opinion, issued by this Court on September 11, 2018, I summarized plaintiff's allegations, as follows, ECF 35 at 3-7:[4]

> Plaintiff alleges that on August 30, 2016, he suffered a stroke and was sent to the University of Maryland St. Joseph Medical Center, where he remained until September 2, 2016. Case II, ECF 1-1 at 4.[] His discharge instructions included orders for medication as well as physical and occupational therapy. *Id*. On October 12, 2016, he underwent assessment at the University of Maryland Medical Center Rehabilitation Department, so that a course of treatment could be developed. *Id*.

Case II), Case I was closed.

[2] The Clerk shall amend the docket to reflect the correct names of defendants.

[3] Plaintiff's motions are little more than demands for damages.

[4] In the Order of the same date (ECF 36), I denied the motion to dismiss filed by the Medical Defendants, and also denied the motion of Church and Leak. But, I granted the motion to dismiss as to BCDC, Cosgrove, and Verch.

Plaintiff states that as a result of this assessment, several medical appointments were scheduled for him between October 28, 2016 and November 30, 2016. *Id*. at 5.

According to plaintiff, on numerous occasions the correctional escort staff caused him to be late for his medical appointments. As a result, he missed ten appointments essential to his health. *Id*. at 9.

For example, plaintiff asserts that he arrived over an hour late for his first therapy session, scheduled on October 28, 2016, and therefore he was declined treatment. ECF 1-1 at 5. He was scheduled for a morning appointment on November 2, 2016, but because he arrived late it was rescheduled to the afternoon. *Id*. The afternoon appointment was cancelled because he was again late. *Id*. Sgt. Leake, who is in charge of the processing area at BCDC, on learning that the appointment was cancelled, advised plaintiff that "'if [he] wanted compassion or adequate medical care, [he] should have stayed home . . . It does not affect my pay check.'" *Id*. at 7. Plaintiff adds that he also missed appointments scheduled for November 4, 9, 11, 18, 23, 25, and 30, 2016. Case II, ECF 1-1 at 7.

Plaintiff is confined to a wheelchair. Therefore, he expresses concern that the lack of appropriate rehabilitation will consign him to remain wheelchair bound, without "a decent quality of life . . . ." *Id*. at 6; *see also id*. at 8.

On November 11, 2016, plaintiff sent a request to medical staff regarding the difficulty in his being processed and transported to his physical therapy appointments. *Id*. at 7. Sgt. Church, who was in charge of processing inmates for transport, was contacted "with no success." *Id*.

Plaintiff was transported to the University of Maryland Medical Center Rehabilitation Department on November 16, 2016, but again arrived late and was declined treatment. *Id*. The physical therapist provided plaintiff a request to give to Dr. Barnes and Bonita Cosgrove so that plaintiff could have access to his tennis shoes in order that plaintiff could practice the exercises he would have performed during physical therapy. *Id*. at 7-8. Plaintiff explains that the tennis shoes were necessary to provide "sure footing and support" while performing his exercises, rather than conducting the exercises in the shower shoes provided by the institution. *Id*. at 8. Plaintiff indicates that the request was not acknowledged and access to his tennis shoes was denied. *Id*.

Mondowney submitted a grievance regarding the occurrences to S. Verch, Bonita Cosgrove, and Deborah Richards. Case II, ECF 1-1 at 8. He received a response to the grievance indicating it was partially substantiated but that no further action would be taken. *Id*.

On February 7, 2017, Lt. Chaddick took plaintiff's rolling walker that had been issued to him pursuant to the order of Mike Swoboda, the Physical Therapist

at the University of Maryland. *Id.* at 20. Lt. Chaddick advised plaintiff that he was acting on the orders of Dr. Barnes. *Id.*

Further, plaintiff alleges that on February 9, 2017, Captain Swainn advised him that the water to the shower in his cell had been turned off to insure that plaintiff did not use the shower, because it was not a shower approved under the Americans with Disabilities Act. Case II, ECF 1-1 at 17. He was advised that if he wanted to shower he needed to do it during the 7 am-3 pm shift in a different area. *Id.* Plaintiff states that the alternative shower was not ADA approved either, as it was not wheelchair accessible nor did it have an attached shower chair. *Id.; see also id.* at 25-34. (Plaintiff's ADA complaint forms filed with the ADA Coordinator for Baltimore County).

Plaintiff indicates he advised all medical staff of the numbness in his right leg when he gets out of bed for the day. *Id.* at 17. He claims that Dr. Barnes refused to address the issue despite other medical providers submitting sick call forms on his behalf. *Id.* at 17-18. Further, he claims that he advised medical staff of his desire to comply with the tasks assigned but needed to do them when blood was circulating or he had sensation in his leg. *Id.* at 18. According to plaintiff, being forced to shower and exercise during the day shift placed him at a risk of harm due to the numbness in his leg during that portion of the day. *Id.* at 19.

In addition, plaintiff alleges that Dr. Barnes tried to force him to do exercises and threatened to take his walker away if he did not do the exercises when she wanted him to. *Id.* at 21-23. He claims that Dr. Barnes required him to complete the physical therapy exercise during specific times, not at night as he had been doing, despite plaintiff explaining that "he did not have any feeling in his right leg." *Id.* at 21. Plaintiff also explained that the physical therapist had directed him to wait to do the exercises until the "pins and needles sensation" has subsided." *Id.* at 21, 22, 23. Plaintiff alleges that Dr. Barnes directed his therapy be done in the "'bull pen'" in the medical unit on a 1.5 inch pad, which plaintiff indicates is not appropriate due to the weakness he experiences. *Id.*

According to plaintiff, as a result of filing a civil rights case, his walker was removed, physical therapy was decreased, and his medical documentation revised to indicate he could walk without an assistive device. Case II, ECF 1-1 at 35. He also claims that he was transported from BCDC to JCI on the floor of the vehicle rather than in a seat, and that after review of his medication documentation at the Jessup Regional Hospital "it was determined that the previous treatments, including physical therapy, were not effective and a consultation with a nerve specialist would be necessary to determine the next course of treatment." *Id.*

**B.    Defendants' Response**

The defendants have produced numerous exhibits to support their contention that plaintiff's

claims lack merit.

A medical note was entered in plaintiff's chart on May 27, 2016, indicating that he was a recent admission to BCDC with a history of lumbar degenerative joint disease and lumbar surgery in February 2016. He reported he had occasional right leg paresthesia. He tolerated Mobic and was on an opiate detox protocol. ECF 48-3 at 37-38.

On May 28, 2016, plaintiff was able to walk with a steady gait and with no assistive device. He had no significant issues with detox. He was cleared for general population, with a bottom bunk and bottom tier status. His lifting was restricted to nothing more than 15 pounds and he was also restricted from using the gym, recreation, or working. ECF 48-3 at 37.

The following day, plaintiff was reportedly irate when he was removed from medical housing to the general population. ECF 48-3 at 37. That same day, plaintiff reported that he was a fall risk in a general population cell due to the low height of the bed and toilet and as such he was returned to the medical ward. *Id*. The regional medical director, Dr. Jerkins, approved plaintiff's remaining in the medical ward for the balance of his sentence based on plaintiff's reporting that he was a fall risk and because his medication would be brought to him. It was noted that the toilet heights are the same throughout the facility. *Id*. at 36.

On May 30, 2016, plaintiff was found beating on the door of his cell with a metal rod he had taken from the shower curtain, complaining that he could not lie down on his bunk, and that he was suffering pain in the middle of his chest. He also complained about unspecified things he claimed the doctor had promised him. ECF 48-3 at 36. Later that day he advised staff that he would not eat because he wanted to avoid defecating due to the toilet being too low and his being afraid he would fall. *Id*. The following day he was provided a portable handicap toilet seat which he reported was helpful. *Id*. at 35. He also continued to receive treatment for lower back pain. *Id*.

A medical note was entered on August 20, 2016, stating that plaintiff was not eating because his meals were not kosher. He was advised regarding the procedure to have his diet changed and an unidentified sergeant indicated he would get plaintiff a bag lunch. ECF 48-3 at 34. On August 23, 2016, plaintiff refused his meal trays. He advised a nurse: "I think I had a stroke last week, and ya'll aint do nothing for me, I aint eating til I get a kosher tray. I aint eating this gar[b]age food." *Id.* But, he refused to go to the medical unit. *Id.* On August 25, 2016, plaintiff ate his lunch. *Id.*

At approximately 4:21 p.m. on August 30, 2016, plaintiff was brought to the medical unit due to his involvement in a fight with another inmate. ECF 48-3 at 33. No lacerations or abrasions were observed. He was offered a cold compress and pain medication and directed to follow up with medical staff as needed. *Id.* He returned to his housing tier. *Id.*

Several hours later, at approximately 7:10 p.m., plaintiff retuned to the medical unit complaining of chest pain radiating to his left arm over the past hour. He was laid down and given aspirin and oxygen. An EKG could not be obtained due to plaintiff's movement. Staff noted that plaintiff's "right arm became flaccid and appeared to not be able to grip my hand." ECF 48-3 at 33. He was described as sweating profusely and he was given nitroglycerin. *Id.*

An ambulance was called, and plaintiff was transferred from BCDC to the University of Maryland, St. Joseph Medical Center, where he was described as presenting with right sided weakness. ECF 48-1 at 3. Plaintiff initially complained of "chest discomfort and mild [shortness of breath], after being involved in some sort of physical altercation where he was struck in the [right] clavicular area with an open hand." *Id.* He advised staff that he fell back into a chair and hit the right side of his neck after which he developed "pins and needles" in his right arm and leg and then suffered from complete right sided paralysis. *Id.*

Plaintiff's initial NIH stroke assessment score improved over time. *Id*. A CT scan of the head and cervical spine were both negative for signs of injury. *Id*. The emergency room consulted with the neurology department and tPA[5] was initiated. Plaintiff continued to have minimal movement of his right leg, but experienced improvement in his right arm. He was admitted to the ICU for further neurological monitoring and treatment. *Id*.

On August 31, 2016, plaintiff underwent an MRI of the brain, which showed no abnormalities. ECF 48-1 at 3. He was started on aspirin. A complete stroke "work up," which included an ultrasound of plaintiff's carotid arteries, was negative. An echocardiogram showed no evidence of an interatrial septal shunt. However, moderately depressed left ventricular function was observed. During plaintiff's hospitalization he exhibited bradycardia, and sinus brady with a heart rate in the 50s. *Id*. His blood pressure remained stable. Cardiology examined plaintiff and started him on Aldactone,[6] Beta blockers, and other medication to lower his blood pressure. Plaintiff's cardiomyopathy did not appear to be due to restrictions in blood supply and it was noted that it could be related to a viral illness plaintiff suffered the previous year, given his reported shortness of breath. *Id*.

At the time of his discharge from the hospital on September 1, 2016, plaintiff's neurological function was described as unchanged. He continued to have slightly decreased strength in the right lower extremity, but the upper extremity deficits had resolved. ECF 48-1 at

---

[5] Tissue plasminogen activator, or tPA, is a drug given via intravenous therapy and works by dissolving the clot and improving blood flow to the part of the brain deprived of blood flow. *See* https://www.stroke.org/we-can-help/survivors/just-experienced-stroke/stroke-treatments/ (last visited June 24, 2019).

[6] Aldactone is a medication used to treat high blood pressure and heart failure. It lowers high blood pressure and helps to prevent strokes, heart attacks, and kidney problems. *See* https://www.webmd.com/drugs/2/drug-6671/aldactone-oral/details (last visited June 24, 2019).

3.  It was also noted that plaintiff could bear weight with physical therapy.  Neurology evaluated plaintiff and "thought that there was no evidence of a clinical stroke."  *Id.*

Plaintiff returned to BCDC on September 1, 2016.  ECF 48-3 at 33.  It was noted that he had been admitted to the hospital for "CVA,[7] Cardiomyopathy and bradycardia."  *Id*.  He was described as stable with right sided weakness that was more pronounced in his right leg and he used a wheelchair for mobility.  *Id*. at 32-33.

On September 2, 2016, Dr. Barnes entered the following medical note in plaintiff's chart, ECF 48-3 at 32:

> Inmate is a 47 y.o AAM who has been on the radar of medical for a few days. It is documented that inmate reported having a stroke to Director of Nursing Rawlerson on 8/23/16 during which time he was refusing NOT to eat because he wanted a Kosher Diet. At the same time, Inmate stood up and cursed at DON Rawlerson while moving all 4 extremities.
>
> It is reported by Security that on the evening in question, inmate got up from a wheelchair (which was not given to him by medical), walked to another inmate without difficulty and struck him.  Inmate however goes to the hospital and reports that he was struck in the right clavicular region and fell back (which is not documented). Inmate did receive tPA which should lysed [sic] any clots however all imaging has been negative.
>
> Inmate seen this morning and reporting weakness in his right leg and numbness in his right hand. Vitals were WNL.
>
> There is significant concern for malingering. Weakness is very subjective however Inmate's reports and actions have been inconsistent.
>
> Will order EMG of the right upper and lower extremities to document accordingly. Inmate to be transferred to lock up. Most likely transfer inmate tonight.

Nursing notes for September 2-4, 2016, indicate plaintiff was seen in his bed; that he reported dizziness, lightheadedness, and right sided weakness; he was able to move all extremities;

---

[7]  Cerebrovascular accident is the medical term for a stroke.  *See* https://medlineplus.gov/stroke.html (last visited June 24, 2019).

and he was instructed to get moving in order to regain his upper body strength.  ECF 48-3 at 31-32.  On September 4, 2016, plaintiff requested a wash basin, which was granted, and expressed to medical staff his fear of falling in the shower.  ECF 48-3 at 31.  It was noted that plaintiff denied medical attention when offered.  *Id*.

The following day, plaintiff was observed using his right arm and hand without difficulty.  ECF 48-3 at 31.  Later that day, plaintiff complained of left mid-sternal chest pain.  Later, he advised a correctional officer that his chest pain had resolved, and he had gas.  ECF 48-3 at 30.

Nursing notes from September 6, 2016, show that plaintiff remained on the medical ward and that he was observed moving his right upper extremity without difficulty.  He also reported dizziness.  *Id*.  That same day, Dr. Barnes entered a note that plaintiff moved his right leg with assistance and was able to use his upper body to transfer from the bed to the wheelchair, despite having reported weakness in his right upper arm.  *Id*.  Dr. Barnes also noted that there remained concerns about plaintiff malingering and that overall he was stable and remained on the medical unit due to his wheelchair use and segregation status.  *Id*.

On September 7, 2016, plaintiff reported decreased strength in his right leg.  When asked to push against the nurse's hand it was reported that both the right leg and right arm were strong and could push against resistance.  He was encouraged to continue to move to increase his body strength.  ECF 48-3 at 29.

The following day it was again noted that strength testing of plaintiff's right arm and leg were 5 out of 5.  ECF 48-3 at 28.  On September 9, 2018, staff indicated plaintiff would be transferred to wheelchair accessible housing, as no acute interventions were being provided on the medical ward.  *Id*.

On September 30, 2016, Dr. Barnes referred plaintiff for a physical therapy evaluation due

to secondary right lower extremity weakness.  ECF 48-2 at 2.  He was evaluated by Michael Swoboda, Physical Therapist, on October 12, 2018.  *Id*. Plaintiff complained of difficulty walking and weakness of the right leg.  *Id.*  The therapy notes indicated that plaintiff was hospitalized from August 30, 2016 to September 1, 2016 for possible CVA however tests were negative.

Plaintiff had no previous history of hypertension and reported an inconsistent history for CVA.  *Id*. According to plaintiff, he suffered from upper and lower extremity weakness on August 30, 2016, after treatment with tPA the right upper extremity weakness resolved but the lower extremity weakness continued.  He also complained of numbness throughout the right lower extremity and reported to the physical therapist that he was unable to walk.  *Id*.  The physical therapist described plaintiff as suffering from right lower extremity "motor function deficits of unclear etiology contributing to ambulatory disfunction." *Id*. at 4.  It was noted that plaintiff would benefit from twice weekly physical therapy and he was provided instructions for home exercise. *Id*. at pp. 4-5.

The day of his physical therapy evaluation, a medical note was entered by Nurse Practitioner Jones that the physical therapist recommended plaintiff continue therapy twice a week for four weeks.  ECF 48-3 at 27.  She also noted that plaintiff had been approved for one physical therapy session and was scheduled for EMG studies "as inconsistencies are present."  *Id*.  It was noted that the physician would be notified and the request for additional physical therapy would be assessed by the doctor.  *Id*.

On October 28, 2016, Ronald Church, Jr. was the dayshift Zone 1 supervisor.  His duties included overseeing the intake and outgoing transportation details.  ECF 38-2 (Church Affidavit), ¶¶ 6-7; *see also* ECF 38-8 (Church Intra-Department Correspondence dated 12/13/16).  He avers that he reported for duty at processing at 7:15 a.m. and his first responsibility was to observe the

inventory of the first level armory, which took him about 15-20 minutes. ECF 38-2, ¶¶ 8-9. Church saw that plaintiff was scheduled to be transported to the University of Maryland Medical Center ("UMMC") for physical therapy at 8:00 a.m. but was not in the processing area when Church reported there at 7:15 a.m. *Id.* ¶¶ 9-10. The practice at BCDC was that officers working the first shift would bring those inmates scheduled for transportation before 9:00 a.m. to processing. *Id.* ¶ 12. As this had not occurred, officers working the transportation detail went to plaintiff's housing unit to retrieve him from his cell. *Id.* ¶¶ 12-13. Plaintiff did not leave BCDC until 7:45 a.m., which resulted in his late arrival for his appointment, which was then cancelled. *Id.* ¶ 14.

On November 2, 2016, Church was assigned as the shift supervisor for Bosley building, which meant he was responsible for the operation of that building. ECF 38-2, ¶¶ 15-16; ECF 38-8. The prior day, at the end of his shift, he noted that there were only two inmate transportation details scheduled for November 2, 2016. ECF 38-2, ¶ 17. When Church arrived for work on November 2, 2016, he saw that an additional inmate transportation detail had been added to drop off a passively non-compliant inmate at Spring Gove. *Id.* ¶¶ 18-19.

Church advised Sgt. Martin Leak, who was the Zone 1 supervisor that day, responsible for intake and outgoing transportation details, that two of the officers assigned to processing should transport the first detail at 11:00 a.m. and that the two officers assigned to transportation should, at 11:00 a.m., take the inmate to Spring Grove and plaintiff to physical therapy. ECF 38-2, ¶ 20; ECF 38-3 (Leak Affidavit), ¶¶ 6-7.

At approximately 10:14 a.m. an inmate attempted to hang himself. ECF 38-3, ¶ 9; *see also* ECF 38-9 (General Information Report dated 11/2/16). Officer Lemmon, who was assigned as a transportation officer that day, responded to the call requesting all officers to assist with the

attempted suicide.  ECF 38-3, ¶ 11; ECF 38-9; ECF 38-2, ¶10; *see also* ECF 38-10 (Post Assignment 11/2/16).  Due to the large number of inmates scheduled for transportation, and Officer Lemmon's assistance with the emergency, plaintiff was not transported for his morning therapy appointment.  ECF 38-3, ¶ 12.  Leak contacted UMMC to advise that plaintiff would not be able to make the morning appointment, and UMMC rescheduled plaintiff for that afternoon. *Id.* ¶ 13.

Church learned that the transportation officers had taken the first detail and that at 1:20 p.m. the processing officers were to take the inmate to Spring Grove and plaintiff to physical therapy.  ECF 38-2, ¶¶ 21-22.  Plaintiff's appointment was scheduled for 2:00 p.m.  *Id.* ¶ 22. Church avers that based on his knowledge and experience, it was not possible for plaintiff to make it to his appointment on time and he would not receive therapy.  Therefore, Church cancelled the transport.  *Id.* ¶ 23.  Church did not cancel the appointment in order to deny plaintiff medical treatment, however,  Rather, he cancelled it based on his experience and knowledge regarding the length of time to travel from the facility to the appointment, and the knowledge that if plaintiff were late he would not receive treatment. *Id.* ¶¶ 25-26.  Church expected that the appointment would be rescheduled, and plaintiff would receive treatment. *Id.* ¶ 27.

When Leak learned that Church had cancelled the afternoon appointment because plaintiff could not be transported in time, he advised plaintiff.  ECF 38-3, ¶ 15.  Leak specifically denies plaintiff's allegations that he told plaintiff that, "if [he] wanted compassion or adequate medical care, [he] should have stayed home" or "it does not affect my pay check."  *Id.* ¶ 16.  He avers that plaintiff missed the appointment of November 2, 2016, because of the large number of inmate transports and the emergency that caused Officer Lemmon to be called away from her transportation assignment.  ECF 38-3, ¶ 20.

Church and Leak each deny having any knowledge of plaintiff's medical issues, other than that plaintiff used a wheelchair. ECF 38-2, ¶ 24; ECF 38-3, ¶¶ 17-18. They each also deny any knowledge that rescheduling plaintiff's physical therapy appointment would affect him medically. ECF 38-2, ¶ 28; ECF 38-3, ¶19. In addition, Leak indicates that when an inmate misses an appointment it is rescheduled for another date. ECF 38-3, ¶ 19.

Church denied any additional knowledge of plaintiff missing other physical therapy appointments, and indicates that these were the only two interactions he had with plaintiff. ECF 38-2, ¶¶ 30-31. Similarly, Leak was not the inmate transportation supervisor on any other dates for which plaintiff alleges that he missed appointments; the interaction on November 2, 2016, was Leak's only interaction with plaintiff. ECF 38-3, ¶¶ 21, 23.

The day after the incident of November 2, 2016, plaintiff filed an inmate complaint alleging that he was either not transported or arrived late for his physical therapy appointments. ECF 38-4 (Verch Affidavit), ¶ 5. Medial Liaison Bonita Cosgrove was assigned to investigate the complaint. *Id*. ¶ 6. Cosgrove completed her investigation on November 28, 2016. *Id*. ¶ 7; *see also* ECF 38-5 (email summary of complaint from Cosgrove to Verch). She determined that some of plaintiff's allegations were substantiated, in that he was either not transported or arrived late for some of his physical therapy appointments. ECF 38-4, ¶¶ 8-9. Plaintiff was instructed to perform physical therapy exercises on his own between appointments. *Id*. ¶ 10. Verch advised plaintiff that the missed/late appointment issue had been addressed. *Id*. ¶ 12. He did not receive any additional complaints from plaintiff regarding missed or late appointments. *Id*. ¶ 15.

On November 7, 2016, plaintiff submitted a Healthcare Request form asking permission to use his personal shoes to provide ankle and arch support while performing exercises prescribed by the physical therapist. ECF 38-4, ¶16. Plaintiff complained that the facility-issued canvas shoes

were too slippery to complete the exercises and he had to wear his shower shoes while exercising. *Id*. ¶ 17. Because the complaint was medically related Verch again assigned the complaint to Cosgrove for investigation. *Id*. ¶ 18.

Dr. Barnes entered a medical note on November 10, 2016, regarding plaintiff's request to use his personal shoes rather than the facility-issued shoes. She also noted that plaintiff reported he arrives late for physical therapy and the physical therapist told him to practice the exercises in his housing unit. ECF 48-3 at 26. In support of plaintiff's request for use of personal shoes, he also reported that he had a preexisting ankle injury from a motor vehicle accident. *Id*. Dr. Barnes noted that the ankle injury was not reported in any of plaintiff's medical records and that physical examination did not demonstrate any deficit. *Id*. As such, she denied plaintiff's request to use personal shoes. *Id*. But, Dr. Barnes indicated that plaintiff could be provided insoles if he needed arch support. *Id*. Dr. Barnes also advised plaintiff that she would notify the jail administrator about his complaints of being late for physical therapy, which she did via email. *Id*.

The following day, plaintiff was involved in an altercation with another inmate and his housing assignment was changed. ECF 48-3 at 26.

On November 16, 2016, plaintiff returned from physical therapy, which he had attended wearing shower shoes. A note was sent indicating that plaintiff would benefit from access to shoes to work on standing and stepping activities and that plaintiff reported difficulty performing those activities with shower shoes. ECF 48-3 at 25. Plaintiff advised Dr. Barnes that the physical therapist told him to wear the shower shoes over the State-issued shoes because they provided more traction. *Id*. Plaintiff also complained that he did not have ankle support. *Id*. Plaintiff was advised that there was no documentation of an ankle issue and that the physician would call the therapist to discuss the shoe situation. *Id*. Dr. Barnes noted that she would look at plaintiff's

personal shoes for consideration of their use when he goes to therapy. She advised plaintiff that all inmates are given the same shoes and there were no known reports of falling due to the shoes being slippery. Further, she advised that it was unlikely he would be given his personal shoes for use in the detention center, but she would make another attempt to discuss the issue with the physical therapist. *Id.* at 25-36.

The next day, Dr. Barnes spoke with the physical therapist, who did not recall stating that the State-issued shoes were inappropriate. ECF 48-3 at 25. Dr. Barnes indicated that she would allow plaintiff to use his sneakers when he went to physical therapy and would also ask custody staff to take the State-issued shoes to physical therapy, so they could be evaluated by the therapist. *Id.* Dr. Barnes noted that plaintiff's personal shoes were a fashionable low top Nike, which would not provide ankle support. *Id.* Plaintiff received physical therapy on November 23, 2016. ECF 38-4, ¶ 11.

On December 10, 2016, plaintiff was again housed in the medical unit due to administrative reasons. ECF 48-3 at 25. He complained of chest pain on December 11, 2016, which began the day before. He denied any pain radiating to his arms or dizziness. *Id.* He refused meals, indicating that he was unable to use the toilet seat because it was too low for him and that he needed a wheelchair accessible cell. *Id.* at 24. It was noted that plaintiff would be provided a bedside commode so that the toilet seat would not be too low for him. *Id.* Plaintiff continued to refuse his meals on December 11 and 12, 2016. *Id.*

On December 12, 2016, plaintiff was placed on suicide watch. ECF 48-3 at 24. Dr. Barnes recounted plaintiff's medical history, including that he had been evaluated on August 30, 2016, for CVA and given tPA; he was sent to physical therapy but reported missing sessions; he complained of falls and weakness. *Id.* She also noted that several security officers reported seeing

plaintiff walk and plaintiff had been involved in several altercations with other inmates, resulting in "keep separate orders." *Id*. Plaintiff had recently received an infraction for stealing other inmates' food and, because of his use of a wheelchair, was brought to the medical ward for restrictive housing. *Id.*

During the weekend, plaintiff began a hunger strike. Dr. Barnes noted that plaintiff might have had access to the commissary at the beginning of his hunger strike but refused meal trays. He only intermittently allowed staff to take his vital signs but did provide a urine sample, which had ketones. *Id*. Dr. Barnes advised plaintiff of the risks of his behavior, including injury to his cardiovascular, neurologic, and renal systems. Plaintiff indicated that the damage could not be worse than staying in the "chair forever." *Id*. Ultimately, when plaintiff was advised that he was on suicide watch, he accepted a bag lunch. Dr. Barnes noted that plaintiff would be maintained in a cell with a camera, his meals monitored, and his mental health would continue to be assessed. The suicide watch was discontinued. *Id.*

Plaintiff remained in the medical ward on administrative housing until December 23, 2016. He was monitored during that time and was in no apparent distress. ECF 48-3 at 20-23.

On January 4, 2017, after plaintiff retuned from physical therapy, Dr. Barnes noted that the physical therapist recommended that plaintiff have access to a rolling walker and street shoes to work on standing exercises and his gait. ECF 48-3 at 19-20. That same day, plaintiff was given a picture of the shoes approved by medical staff, but plaintiff insisted that security staff had approved a different pair of shoes. *Id*. at 19.

The walker was received on January 12, 2017, and Dr. Barnes wrote in plaintiff's chart that he could have his shoes while housed in the medical ward, so that he could practice using the walker. *Id*. at 17. Plaintiff was provided with the walker and his shoes the next day. *Id.*

After investigation of plaintiff's complaint regarding use of his personal shoes, Cosgrove determined that no other inmate at BCDC had suffered a slip and fall while wearing the facility issued canvas shoes. ECF 38-4, ¶ 19; *see also* ECF 38-6 (Intra-Department Memorandum dated 2/2/17 concerning plaintiff's complaint of discrimination in medical care). Cosgrove also documented Dr. Barnes' actions and recommendations regarding use of the personal shoes, including the January 4, 2017 recommendation of the physical therapist that plaintiff have access to street shoes to work on standing exercises and gait. *Id.* ¶¶ 20-24. Given that the recommendations of plaintiff's physical therapist were approved, Verch found plaintiff's allegations to be unsubstantiated. *Id.* at ¶ 30.

Dr. Barnes entered a note in plaintiff's chart on February 3, 2017, stating that while he was receiving offsite physical therapy for his right leg weakness, he had also been advised to complete home physical therapy. ECF 48-3 at 11. Due to security reasons, plaintiff was again housed on the medical ward. While on the ward plaintiff was permitted to use the walker for exercise and staff was directed to provide him with his walker during the 7 a.m. to 3 p.m. shift, so that he could complete his exercises. It was determined that plaintiff would receive the walker during that shift due to increased staff presence. Plaintiff reported, however, that he completed his home exercises during the 11 p.m. to 7 a.m. shift. *Id.*

On January 30, 2017, plaintiff reported to his physical therapist that he completed his standing exercises with the walker but on January 28, 2017, he had an episode of his right leg "giving out," which resulted in his falling back on to the bunk. ECF 48-3 at 11. He reported that he used the walker to and from the shower and he continued to suffer numbness in the right lower leg. *Id.* In light of the reported fall and inability to verify whether plaintiff was actually completing the home exercises Dr. Barnes decided to bring plaintiff to the medical unit where staff would be

available to monitor his physical therapy.  *Id*.  However, plaintiff refused to complete physical therapy under supervision and maintained he was unable to complete the exercises due to numbness in his leg. This same complaint had not previously limited plaintiff's ability to perform physical therapy. Plaintiff also argued that the 7 a.m. to 3 p.m. shift was too early, even though his offsite appointments were during that time.  *Id*.  Plaintiff did not complete the standing physical therapy exercises but had other exercises he could complete in his bed.  *Id*. at 11-12.

During this time, the physical therapist requested one more appointment, which was approved.  This brought the total requested therapy sessions to eight.  ECF 48-3 at 13.

On February 6 and 7, 2017, plaintiff was to be brought to medical during the 7-3 shift for physical therapy and documentation of physical therapy participation. ECF 48-3 at 13.  Plaintiff refused to participate in the onsite physical therapy on February 7, 2017.  *Id*.  Plaintiff again refused to participate in onsite physical therapy on February 8, 11, 16, 22, 25, 27 and 28, 2017, as well as March 11, 2017.  ECF 48-3 at 10, 8, 4-6, 2.

Plaintiff submitted a sick call slip on February 13, 2017, claiming it was his sixth sick call slip regarding right leg numbness.  But, there was no evidence of previous sick call slips.  ECF 48-3 at 9.  Dr. Barnes recounted plaintiff's history, and that he had been given onsite exercises, but that he refused to complete them during prescribed times.  Plaintiff went to physical therapy that day and reported he received stimulation but did not perform standing exercises.  *Id*.  Dr. Barnes called the physical therapist, who indicated there was no report that plaintiff should stop doing the standing exercises.  Plaintiff was encouraged to continue the standing exercises and advised that these exercises would improve his strength and sensation.  Dr. Barnes indicated she would place a consultation request for an EMG and would continue the order for physical therapy. *Id*. at 9.

On February 15, 2017, Cosgrove responded to plaintiff's complaints under the Americans

With Disabilities Act that he was housed in cells where the toilet was too low; he did not have access to a shower that accommodated a wheelchair or that had a shower chair; and had not been provided with appropriate assistive devices to prevent falls or injuries. ECF 38-12. In denying his claims, Cosgrove noted that plaintiff had been provided a wheelchair and assigned to a housing unit that accommodated a wheelchair. Additionally, he had been provided a commode chair which offered the proper height and handles for use and, at that time, was housed in an area with a toilet of sufficient height. Further, she noted that arrangements had been made for plaintiff to use a walker in a supervised setting. And, plaintiff was authorized to use the shower adjacent to his housing area, which was ADA compliant and had two different shower chairs for his use. *Id.*

Plaintiff was observed on February 22, 2017, using the handicap shower with his walker. He was standing on both feet using one hand to wash. ECF 48-3 at 6.

On February 27, 2017, Dr. Barnes noted that plaintiff continued to complain of right leg numbness and continued to refuse to participate in observable onsite exercises. ECF 48-3 at 5. He also refused to shower during the day while additional staff were present, but showered occasionally in the evening/night without incident. The consultation for EMG was approved. *Id.*

On March 6, 2017, Dr. Barnes again noted plaintiff's continued refusal to participate in on site exercises as well as his refusal to shower during the day. She noted that she was still awaiting the date for the EMG. ECF 48-3 at 1. Appointments for neurology were then being scheduled into May, and she indicated she would call the neurologist to see if the EMG could be scheduled sooner. *Id.*

Plaintiff continued to be housed on the medical ward, where he was monitored throughout the day, reported no concerns, and was not in any distress. ECF 48-3 at 1-19. He was transferred to the Division of Correction on March 13, 2017. *Id.* at 1.

## II. Standard of Review

The County Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. The Medical Defendants have moved for summary judgment.

A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed App'x. 220, 222 (4th Cir. 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural

rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

Notably, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F.Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v.*

*Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted). Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff sought to obtain certain video footage. ECF 45. However, the video evidence that plaintiff requested was unavailable. ECF 47. The Medical Defendants did not adequately explain their request for discovery. *See* ECF 46 at 2. Similarly, plaintiff failed to explain the relevance of the two correctional witnesses he identified, who supposedly were aware of Dr. Barnes's negative attitude towards plaintiff. *Id.* I am satisfied that it is appropriate to address the defense motions as motions for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541

U.S. 1042 (2004). And, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

### III. Discussion

#### A. Section 1983

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied,* 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey,*

*Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit

authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

### B. Deliberate Indifference to Serious Medical Needs

Construing plaintiff's allegations liberally, he alleges that he suffered a stroke on August 30, 2016, while in the custody of the Baltimore County Department of Corrections, and that Dr. Barnes, Officer Leake, and Officer Church interfered with prescribed medical treatment by failing to insure that he was transported timely to scheduled physical therapy appointments. Further, he alleges that Dr. Barnes denied him his medically prescribed walker and tennis shoes; that she forced him to participate in a home exercise regimen; and she required him to take showers at times that were medically unsafe for him. He contends that defendants violated his rights under the Americans with Disabilities Act.

Presumably, plaintiff was a pretrial detainee while housed at BCDC. "Pretrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." *Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-44 (1983)); *see Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Patten v. Nichols,* 274 F.3d 829, 834 (4th Cir. 2001). The Due Process Clause of the Fourteenth Amendment protects the rights of pretrial detainees to receive adequate medical care. *Hill v. Nicodemus*, 979 F.2d 987, 990-91 (4th Cir. 1992); *see also Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating, *inter alia*, that if the defendant "was a pretrial detainee rather than a convicted prisoner, then the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, 'mandates the provision of medical care to *detainees* who require

it'") (emphasis added in *Brown*) (citation omitted).

Therefore, "[t]he constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment." *Barnes v. Wilson*, 110 F.Supp.3d 624, 629 (D. Md. 2015) (citing *Bell*, 441 U.S. at 535); *see Brown v. Harris*, 240 F.3d at 388 ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977)). Thus, a prison official violates a detainee's Fourteenth Amendment rights when the official is deliberately indifferent to the detainee's serious medical needs. *See Young*, 238 F.3d at 575 ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."); *see also Hill,* 979 F.2d at 991 (adopting the standard of "deliberate indifference" with respect to the level of care owed to a pretrial detainee under the Fourteenth Amendment); *Gordon v. Kidd,* 971 F.2d 1087, 1094 (4th Cir. 1992) ("Pretrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs."); *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.") (citing *Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir. 1988)).

Because a detainee's rights are comparable to a prisoner's rights, I turn to consider the Eighth Amendment. It prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir.

2016); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). The deliberate indifference standard consists of a "two-pronged test: (1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38); *see Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

A claim of denial of adequate medical care, whether lodged under the Eighth Amendment or the Fourteenth Amendment, requires a court to analyze the same issue: whether there was deliberate indifference to a serious medical need. In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A "'serious ... medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff

were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *Farmer*, 511 U.S. at 837; *see Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). As the *Heyer* Court put it, "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." *Heyer*, 849 F.3d at 209-10.

"The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor,* 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*). But, "the objective component of an Eighth Amendment claim based on a deprivation of medical attention is satisfied only if the medical need of the prisoner is "'serious.'"" *Shakka v. Smith*, 71 F.3d 162, 166 (4h Cir. 1995) (citations omitted).

Proof of an objectively serious medical condition does not end the inquiry, however. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40.

In order "[t]o show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted). The deliberate indifference standard "'entails more than mere negligence ... it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835). The subjective component requires "subjective recklessness" in the face of the a serious medical condition. *See Farmer*, 511 U.S. at 839-40; *see also Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017).

In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *City of Mt. Ranier*, 238 F.3d at 575-76. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference."

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'" *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98. But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014); *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013).[8]

_____

[8] The Supreme Court has rejected the "significant injury" requirement in regard to an

A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk . . . ." *Brice*, 58 F.3d at 105.

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178. In *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000), the Court said: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences ... To lower this threshold would thrust federal courts into the daily practices of local police departments." Therefore, mere negligence or malpractice does not rise to the level of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble, supra*, 429 U.S. at 106).

A delay in medical treatment may constitute deliberate indifference. *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (citing *Estelle*, 429 U.S. at 104-05). In that circumstance, the plaintiff must show that the delay in providing medical care caused him to suffer substantial harm. *See Webb v. Hamidullah*, 281 Fed. Appx. 159, 166 (4th Cir. 2008). Substantial harm can be shown

---

excessive force claim under the Eighth Amendment. *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (per curiam); *see Danser*, 772 F.3d at 346 n.8 (distinguishing deliberate indifference claims).

by "lifelong handicap; permanent loss, or considerable pain." *Shabazz v. Prison Health Servs. Inc.*, 2011 WL 3489661, at * 6 (E.D. Va. 2011) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *see also Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995).

Nevertheless, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Stated another way, "'society does not expect that prisoners will have unqualified access to health care.'" *Shakka*, 71 F.3d at 166 (quoting *McMillian*, 503 U. S. at 9).

And, even if the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d at 390 (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016).

In *Scinto*, the Fourth Circuit said, 841 F.3d at 226:

A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus must have known about it...." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

There is no evidence here that plaintiff suffered any injury as a result of any of the alleged

conduct. As to the physical therapy appointments that plaintiff missed, it is clear that Dr. Barnes was not responsible for those occurrences. To the contrary, she approved plaintiff receiving physical therapy, inquired with custody staff when plaintiff advised her that his appointments had been missed, consulted regularly with plaintiff's off-site physical therapist regarding his treatment plan, approved his use of street shoes and a rolling walker, and endeavored to have plaintiff receive assistance with completing his "home" exercise regime. Dr. Barnes' actions do not evidence deliberate indifference or a callous disregard for plaintiff's serious medical need.

Plaintiff claims that he missed ten therapy appointments, either because he was not transported or not being transported in a timely manner. The evidence is unclear whether plaintiff actually missed ten appointments. But, taking his allegation as true, only two of the missed appointments involved the named correctional officers, Leak and Church. As to each of these appointments it is clear that circumstances outside their control were the cause of plaintiff's missed appointments. Further, neither Leak nor Church cancelled the scheduled appointments in an effort to interfere with plaintiff's prescribed medical treatment, and both believed that the appointments would be timely rescheduled. Where, as here, the alleged deficiency in medical care (missed appointments) is not due to the conduct of the named defendants it cannot be said that the defendants were deliberately indifferent to a serious medical need.

As to plaintiff's claims that Dr. Barnes denied his access to a walker or his street shoes for use during physical therapy, his claim is not supported by the record. The uncontroverted evidence demonstrates that at first Dr. Barnes denied plaintiff use of the street shoes, finding that the institutionally issued shoes were not slippery, as plaintiff claimed, and that the street shoes did not provide the support plaintiff indicated he required. Additionally, Dr. Barnes spoke with the physical therapist, who disputed telling plaintiff that his institutionally issued shoes were

insufficient. Later, after further consultation with the physical therapist, plaintiff was permitted to use his street shoes to complete his physical therapy exercises. A delay in approving plaintiff's use of his own shoes pending verification that it was necessary does not support a constitutional claim.

As to the walker, when the physical therapist recommended plaintiff conduct home exercises with a rolling walker, the walker was ordered and provided to plaintiff. Dr. Barnes directed that plaintiff be provided use of the walker during the morning shift due to an increased number of staff during that time, which helped to insure the safety of plaintiff and the institution. Dr. Barnes's conduct does not suggest a deliberate indifference to plaintiff's serious medical needs. To the contrary, it reflects careful consideration and consultation with other medical providers and staff as to how best to meet plaintiff's needs. Plaintiff's mere disagreement with the course of treatment is insufficient to sustain his claim.

Plaintiff's similar complaints regarding the timing of his onsite physical therapy and showers is unavailing. The record evidence demonstrates that medical staff doubted the basis for plaintiff's complaints of leg weakness as well as the veracity of his claims, and also doubted whether he was completing the prescribed home exercise program. Those doubts were based on objective observations of plaintiff's abilities, as reported by correctional staff. To insure plaintiff was completing his home exercises, Dr. Barnes directed that those exercises should be performed in the medical unit under supervision. Additionally, to insure plaintiff's safety in the shower it was directed that he shower during the day shift, while additional staff was present, in an ADA accessible shower that was equipped with shower chairs. Plaintiff's stated preference to perform these activities at another time is simply a disagreement with the prescribed plan of treatment and is insufficient to state a constitutional claim.

The evidence, viewed in the light most favorable to plaintiff, establishes that he received constitutionally adequate medical care. When viewing the evidence as a whole and in the light most favorable to plaintiff, no evidence exists that the conduct alleged amounted to deliberate indifference by the named defendants. *See Estelle*, 429 U.S. at 105-06 (holding that an inadvertent failure to provide adequate medical care does not amount to deliberate indifference). Indeed, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)). No exceptional circumstances exist here.

Additionally, plaintiff makes no direct allegations against Correct Care Solutions. Instead, he seeks to hold Correct Care Solutions liable for the actions of its employee. It is well established, however, that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983). Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal

link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Here, plaintiff has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by Correct Care Solution's employee. As discussed above, plaintiff failed to show that his constitutional rights were violated. Accordingly, he has necessarily failed to demonstrate that Correct Care Solutions authorized or was indifferent to any such violation. Plaintiff's assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse."). Correct Care Solutions is therefore entitled to summary judgment.

### C. Americans with Disabilities Act ("ADA")

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). Title II of the ADA, which is at issue here, prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132.

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). State prisoners, such as plaintiffs, may qualify as "qualified individual[s] with . . . disabilit[ies]," *id.*, so as to come within the protection of Title II of the ADA. In *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998), a unanimous Supreme Court held that "the plain text of Title II of the ADA unambiguously extends to state prison inmates."

To establish a prima facie case under Title II of the ADA, plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016) *(*citing *Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)); *Baird ex rel. Baird v. Rose,* 192 F.3d 462, 467 (4th Cir. 1999) (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995)). States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. *See Fry v. Napoleon Cmty. Sch.*, ___ U.S. ___, 137 S.Ct. 743, 749 (2017) ("A regulation implementing Title II requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination" (quoting 28 C.F.R. § 35.130(b)(7))); *Lamone*, 813 F.3d at 507-08; *see also* 42 U.S.C. § 12131 *et seq*.

A reasonable modification does not require the public entity to employ any and all means

to make services available to persons with disabilities. *Constantine*, 411 F.3d at 488-89. Rather, the public entity is obligated to make those modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade*, 480 F.3d 1072, 1082 (11th Cir. 2007); *see also Lamone*, 813 F.3d at 507-08 ("A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship.'") (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012)); *Pashby v. Delia*, 709 F.3d 307, 323 (4th Cir. 2013).

To the extent that plaintiff claims that a denial of medical treatment violates his rights under the ADA, the claim fails. Although the Fourth Circuit has not addressed this issue in a published opinion, unpublished cases from this circuit, as well as published and unpublished cases from other circuits, indicate that a prisoner may not state a claim under the ADA for a lack of medical treatment. *See, e.g., Goodman v. Johnson*, 524 F.App'x 887, 890 (4th Cir. 2013) (affirming dismissal of ADA claim that alleged prison's refusal to provide inmate contact lenses, instead of glasses, to correct his impaired vision, as inmate failed to indicate that, due to his disability, he had been deprived of benefits for which he was otherwise qualified); *Miller v. Hinton,* 288 F.App'x 901, 902-03 (4th Cir. 2008) (ruling that prison's alleged denial to prisoner of access to colostomy bags and catheters did not violate the ADA absent a showing that inmate was treated in that manner because of his disability); *Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1144 (10th Cir. 2005) (stating that inmate's claims under ADA were properly dismissed for failure to state claim, as they were based on medical treatment decisions); *Spencer v. Easter,* 109 F. App'x 571, 573 (4th Cir. 2004) (concluding that failure to provide timely refills of prescription drugs did not amount to an ADA violation where there was no showing that it was done based on prisoner's disability); *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir. 1996) (concluding that the ADA is not "violated by a

prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled.").

Moreover, plaintiff has failed to demonstrate that he was treated differently based on his disability or that any of the named defendants failed to accommodate his disability. Plaintiff filed complaints alleging that the toilet in his cell was too low; his shower did not accommodate a wheel chair and shower chair; and there were a lack of assistive devices to prevent falls or injuries. ECF 1-1 at 27, 29, 32, 25. However, the record establishes he was confined in housing areas that accommodated the use of his provided wheelchair; he was provided a portable commode, which offered both the height and handles necessary for ease of use; and arrangements were made for plaintiff's use of a walker in a supervised setting for performance of prescribed strengthening exercises. Arrangements were also made for plaintiff to use an ADA-compliant shower adjacent to his housing unit, which had two shower chairs for his use.

There is no support in the record for plaintiff's bald assertions that the ADA was violated. Defendants are entitled to summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment will be granted. Judgment will be entered in favor of defendants and against plaintiff. A separate Order follows.


July 18, 2019                                    _____/s/_____
Date                                             Ellen L. Hollander
                                                 United States District Judge